UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TONYA TILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-1641-DFH-JMS |
| | ) | |
| CITY OF LAWRENCE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Tonya Tilson has been a police officer for the City of Lawrence since 1996.  She alleges that she was the subject of sex and pregnancy discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 and the Pregnancy Discrimination Act and that the defendants violated her rights under the Fourteenth Amendment by infringing her right to associate with her father. Defendants the City of Lawrence and Deborah Cantwell and Jack Bailey, in their official and individual capacities, have moved for summary judgment on each of Tilson's claims.  As explained below, the undisputed facts show that defendants are entitled to summary judgment as to all claims.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving parties entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  The moving parties need not positively disprove the opponent's case; rather, they may prevail by establishing the lack of evidentiary support for that case if the non-moving party bears the burden of proof.  See *Celotex Corp.*, 477 U.S. at 323.  Where the non-moving party bears the burden of proof on an issue at trial and the motion challenges that issue, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e)(2); see also *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).

A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented.  See *id.*  In deciding a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence; the court must

view all the evidence in the record in the light reasonably most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.  See Fed. R. Civ. P. 56(c);  *Anderson*, 477 U.S. at 249-50.

## *Material Facts Not In Dispute*

### I.   *The Parties*

Plaintiff Tonya Tilson has been a police officer for defendant City of Lawrence since 1996.  In 1998, she became a detective and was promoted to the rank of sergeant.  She returned to the patrol division approximately five years later by choice.  Tilson's file contains several commendations from the public and her supervisors for her accomplishments and performance as a police officer.  Pl. Exs. B, C, D, E.

Defendant Deborah Cantwell was elected mayor of the City of Lawrence in November 2003, serving in that office from January 2004 through December 2007.  Defendant Jack Bailey has been a police officer with the City of Lawrence since 1987.  He was promoted to captain of operations in March 2005 and to deputy chief in October 2005.  He served as acting chief from April 20, 2006 to December 2006, when he was returned to the rank of captain, and then lieutenant.  Bailey Aff. ¶¶ 1-2.

### II.   *Mayor Cantwell's Administration*

For approximately two years, Mayor Cantwell held weekly lunch meetings with the leadership of the Lawrence Police Department.  Cantwell referred to these meetings as the "Cunt Club."  Bailey Pl. Aff. ¶¶ 5-7; Bowser Aff. ¶¶ 8-10; Burns Aff. ¶¶ 6-7.  The "password" used at these meetings was also "c***."  Bailey Pl. Aff. ¶ 8; Bowser Aff. ¶ 11; Burns Aff. ¶ 8.  The password was derived from Cantwell's term for the female members of the Lawrence police department.  Bailey Pl. Aff. ¶ 9;  Bowser Aff. ¶ 12;  Burns Aff. ¶ 9.  Cantwell routinely referred to Tilson using that term.  Bailey Pl. Aff. ¶¶ 10; Bowser Aff. ¶¶ 13; Burns Aff. ¶ 10.  Tilson did not attend these meetings and, before filing her lawsuit, knew nothing about them.  Tilson Dep. 228-30.  She learned of Cantwell's use of the word "c***" only when she was contacted by an attorney working on another case.  *Id.*

III.    *Tilson's Family*

Tilson is the daughter of Paul Whitehead, who is the current Chief of Police and a former Republican member of the Lawrence City Council.  Tilson Dep. 9, 19-20, 40-41; Bailey Aff. ¶ 35; Gliszczynski Aff. ¶ 22.  Whitehead and Cantwell, a Democrat, often clashed on matters of city business.  Tilson Dep. 40-41; Bailey Aff. ¶ 35; Gliszczynski Aff. ¶ 22.  Tilson testified that neither Mayor Cantwell, former Chief Jack Bailey, nor anyone associated with the City of Lawrence ever prevented Tilson from maintaining a relationship with her father.  Tilson Dep. 254-55.  She was able to maintain the same relationship with him in spite of being assigned to dispatch, as described below.  Tilson Dep. 255.

IV.     *Tilson's Pregnancy and Assignment to Light Duty*

Tilson became pregnant in 2004.  In August 2004, Tilson requested medical attention after a traffic accident, and her pregnancy then became known at the police department and in the city administration.  Tilson Dep. 42.  When she was four months pregnant, she was removed from patrol duty and assigned to the administration office, though she had not requested a light duty assignment. Tilson Dep. 44.  She believed she was assigned to administration out of concern for the health of her unborn child.  Tilson Dep. 49.  Tilson had intended to request light duty a little later, when she was five or six months pregnant.  Tilson Dep. 51. Tilson formally requested light duty on November 12, 2004, and she believed that the decision to request light duty was ultimately up to her.  Tilson Dep. 49, 53. She did not return to road duty during her pregnancy.

While Tilson was under a light duty restriction, she was reassigned to dispatch, working half days at the dispatch center.  She believed that Mayor Cantwell ordered her reassignment to dispatch because Tilson was Paul Whitehead's daughter.[1]  She described the dispatch duties as "more stressful" than working at the police administration office, and she complained about the

_____

[1]In her deposition, Tilson testified that Deputy Mayor Dave Rapp told her that Mayor Cantwell had said that although she could not do anything about Tilson's father, she could do something about Tilson to get back at him.  Tilson Dep. 69.  Tilson's testimony about what Rapp said is inadmissible hearsay as to the individual defendants, though it is admissible against the city itself as a party admission.  See Fed. R. Evid. 801(d)(2)(D) (statement by party's agent concerning matter within scope of agency, made during existence of relationship).

assignment.  Tilson Dep. 70-71, 73.  However, Tilson was never told by her doctor not to work in dispatch, and she suffered no pregnancy complications as a result of this assignment.  Tilson Dep. 73-74.  Tilson testified that a male officer, Joe Williams, was on light duty for three or four months but was not assigned to dispatch during his light duty assignment.  Tilson Dep. 71-72.

V.      *Tilson's Shift Assignment*

The Lawrence Police Department operates on three shifts.  First shift is the day shift, from 6:00 a.m. to 2:30 p.m.  Second shift lasts from 2:00 p.m. to 10:30 p.m., and third shift runs from 10:00 p.m. to 6:30 a.m.  Patrol officers bid on shifts based on seniority.  Supervisory officers, including sergeants, are assigned at the chief's discretion.  Gliszczynski Aff.  ¶ 5.  Officers on the second shift receive a shift differential in pay.  Tilson Dep. 75-76.  Though Chief Gliszczynski asked sergeants to indicate their preferred shifts, he was not always able to accommodate them.  Gliszczynski Aff.  ¶ 5.

Prior to her pregnancy, Tilson had always been assigned to the shift she had requested.  Tilson Dep. 31.  Tilson wanted to work on the day shift upon her return from maternity leave because of child care.  Chief Gliszczynski was aware of Tilson's preference, but also knew that Sergeant Art Thomas, who had thirty years' seniority above Tilson, had been on second shift for several years in what was meant to be a "temporary" assignment.  Gliszczynski Aff. ¶¶ 6-7.  Based on

Thomas' greater seniority,  Gliszczynski wanted to give Thomas an opportunity to return to the day shift if he wished before assigning Tilson.  *Id.* at ¶ 7.  Bailey, who was then captain, asked Thomas if he wanted to return to days, and Thomas said that he would need to talk with his wife.  Bailey Aff. ¶ 5.  Tilson testified that initially Thomas told her he was not keen on the idea of moving back to the day shift because he would retire soon and was not interested in making any changes.  Tilson Dep. 89.  Thomas later told her that Bailey contacted Thomas' wife and told her that there was an opening on the day shift, and Thomas decided that he did not have a choice but to go to the day shift.  Tilson Dep. 94-95.  Thomas then was assigned to the day shift, and Tilson was assigned to second shift.  Gliszczynski Aff. ¶ 7; Bailey Aff. ¶¶ 5-6.

All other officers who took leave between February 2004 and February 2006 were reassigned to their previous shifts upon their return.  Among those officers, Tilson was the only one who had previously been assigned to administrative light duty.  Pl. Ex. Z.  Tilson was assigned to second shift to balance the number of sergeants assigned to day shift and second shift.  Gliszczynski Aff. ¶ 8; Bailey Aff. ¶ 4.  She was informed of her shift assignment a few days before she returned to work and had to "scramble" to find child care.  Tilson Dep. 91.  After Tilson was assigned to second shift, another first shift position opened and a male officer, Rick Harris, was assigned instead of Tilson.  Tilson Dep. 97.  A year later, when Tilson submitted her shift preference for 2006, she indicated she wished to remain on second shift.  Tilson Dep. 102, Ex. 12.

VI.     *The Marion County Traffic Safety Partnerhsip*

The Lawrence Police Department participates in the Marion County Traffic Safety Partnership (the "Partnership").  Officers involved in the Partnership are paid through a grant to provide extra traffic enforcement.  The officers provide the enforcement outside their regular work hours, and the grant money they receive for those hours is in addition to their regular pay.  Bailey Aff. ¶ 9; Tilson Dep. 31-32.  One Lawrence police officer is responsible for the department's administrative tasks for the Partnership, including providing traffic enforcement statistics and submitting claims for payment on behalf of participating officers.  The officer who handles these responsibilities does so in addition to his or her regular duties with the Lawrence Police Department, but does that work during normal work hours and does not receive additional pay.  Tilson Dep. 15, 35-36.[2]

About one year before her maternity leave, Tilson took over responsibility for the administrative work for the Partnership.  Tilson Dep. 34.  On June 13, 2005, days after Tilson returned from maternity leave, Captain Bailey informed her that she would no longer administer the Partnership for the department and

---

[2]Tilson's brief asserts that she received extra pay for performing the administrative work for the Partnership, which took four hours per week on top of the four to eight hours per month of extra patrol work required for general Partnership participation.  See Tilson Br. 8-9, citing Tilson Dep. 13-15, 35.  Tilson's deposition testimony does not support this assertion.  She testified that, as administrator of the Partnership, she would work four to eight hours per month on the street, Tilson Dep. 13-15, and complete the administrative paperwork that took about four hours per week during her regular work hours.  Tilson Dep. 35.  She was asked:  "Did you receive extra pay for doing this?"  Her answer was "No."  Tilson Dep. 35-36.  There is no contrary evidence.

that those duties were being assumed by Bruce Wright.  Tilson Dep. 132-33; Tilson Ex. T.  Wright was a patrol officer, and Tilson was a sergeant.  Tilson Dep. 133.  Tilson asked Bailey several times to explain why her duties as administrator had been reassigned, Tilson Dep. 133; Tilson Ex. T, but she was not provided with an explanation.  In March 2007, Tilson resumed responsibility for the Partnership. Tilson Dep. 14.

VII.    *Tilson's June 2005 District Assignment*

The police department divided the City of Lawrence into districts for the purpose of patrolling.  The shift commander of each shift assigns officers to a particular district.  Once assigned, an officer is usually responsible for responding to all runs within his or her district.  Gliszczynski Aff. ¶ 15; Bailey Aff. ¶ 16. Lieutenants and sergeants are considered supervisory officers.  Because of the high number of ranking officers per shift, sergeants were assigned at times to patrol a district.  Gliszczynski Aff. ¶ 15; Bailey Aff. ¶ 17.  Sergeants so assigned would still provide supervisory assistance if needed and would still receive their sergeant rate of pay.  Tilson Dep. 131; Gliszczynski Aff. ¶ 15; Bailey Aff. ¶ 17.

In 2005 and 2006, the shift commander who was responsible for assigning duties to officers assigned to second shift was Lieutenant Greg Swingle. Gliszczynski Aff. ¶ 16.  The second shift schedules for June through November 2005 show that Tilson, who was identified by her car number of 17, was

sometimes scheduled as a supervisor and sometimes scheduled to patrol a district.  Bailey Aff. ¶ 19, Ex. F.  Tilson recalled that, although she and Jim Vaughn were both sergeants, in June 2005 Vaughn was assigned to supervise Tilson's district while she was assigned to patrol.  Tilson Dep. 129-30.  Although in June 2005 Tilson did not have supervisory duties, she received her rate of pay as a sergeant.  Tilson Dep. 131.

VIII.   *Tilson's August 2005 Overtime Request*

In March 2005, Gliszczynski issued a memorandum stating that officers would need to obtain advance approval from a supervisor for any overtime that was not court-related.  Gliszczynski Aff. ¶ 17, Exs. K, L; Bailey Aff. ¶ 23, Exs. G, H.  On the evening of August 25, 2005, Tilson responded to a scene where two traffic accidents had occurred, one resulting from the other.  The accident investigator who arrived at the scene asked Tilson to gather information from the people involved in the crash.  Tilson Dep. 173.  Reserve officers arrived at about 10:45 p.m.  Tilson Dep. 155.  One of the accidents had happened within the jurisdiction of the Lawrence Police Department and the other within the jurisdiction of the Marion County Sheriff's Department.  Tilson told the commanding deputy that Lawrence would handle both accidents because they were related.  Tilson Dep. 154-55, 159-60; Bailey Aff. ¶ 24.

Captain Bailey arrived at the scene at around 10:30 p.m.  He criticized Tilson for agreeing to take both accidents, yelling at her in front of civilians and supervisors from other agencies.  Tilson Dep. 160-61; Bailey Aff. ¶ 24.  Because the accident was adequately covered by other officers and to avoid overtime costs, Bailey ordered all second shift cars to go back into service and to leave the scene. Bailey Aff. ¶ 25, Exs. I, J.  Tilson did not leave.  She testified that she did not hear this order, but she believed that even if she had heard it, it would not have been right for her to leave.  Tilson Dep. 163.  Tilson's shift ended at 10:30 p.m., and she left the scene at 11:00 p.m.  Tilson Dep. 164, 173.

Tilson later requested overtime pay for one half hour.  Tilson Dep. 174-75. Bailey denied the request because she had not obtained advance approval from her lieutenant and her presence was not necessary due to adequate coverage by other officers.  Bailey Aff. ¶ 26.  Tilson believes she should have been paid the overtime she requested because she was the only on-site supervisor (Bailey was "administration"), because she was performing tasks pursuant to the accident investigator's order, and because the reserve officers did not arrive until 10:45 p.m.  Tilson Dep. 155, 163, 165, 173.  This is the only occasion on which Tilson was denied a request for overtime.  Tilson Dep. 180-81.  Additional facts are noted below as needed, keeping in mind the standard for summary judgment.

*Discussion*

I.      *Tilson's Sex and Pregnancy Discrimination Claims*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discharge or otherwise discriminate against an employee in the terms and conditions of employment "because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(2).  In 1978 the Pregnancy Discrimination Act ("PDA"), Pub. L. No. 95-555, 92 Stat. 2076 (1978), amended Title VII by specifying that the terms "because of sex" or "on the basis of sex" include but are not limited to the basis of pregnancy, childbirth, or related conditions.  See 42 U.S.C. § 2000e(k).  Women affected by pregnancy, childbirth, or related medical conditions must be treated the same as unaffected individuals (female or male) for purposes of employment. Tilson claims that she was treated worse than other employees both because she is a woman and based on her pregnancy.  Because the analysis of both claims is identical, they will be considered together.  See *Hall v. Nalco Co.*, — F.3d —, —, 2008 WL 2746510, *3 (7th Cir. July 16, 2008) (explaining that PDA did not create new rights or remedies under Title VII and did not change the basic approach to a Title VII claim).

Tilson may prove discrimination through either the direct or the indirect methods or a combination of the two.  See *Caskey v. Colgate-Palmolive Co.*, — F.3d —, —, 2008 WL 2840833, *4 (7th Cir. July 24, 2008) (sex discrimination); *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2000) (pregnancy discrimination); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th

Cir. 1994) (pregnancy discrimination).  Tilson has elected to proceed using the indirect method, and so she must first offer evidence that:  (1) she was a member of a protected class (for purposes of her PDA claim, here she must show that she was pregnant and her employer knew she was pregnant); (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees not in her protected class were treated more favorably.  See *Griffin*, 489 F.3d at 844.  If Tilson could establish her *prima facie* case with evidence on those points, the burden would shift to the City to articulate a legitimate, non-discriminatory reason for the adverse employment action, and if the court's analysis were to reach that stage, Tilson could withstand summary judgment only by offering evidence that the City's reason was actually a pretext for intentional discrimination.  *Id.*

The City argues that Tilson's claims must fail because she cannot present evidence that she suffered an adverse employment action or that she was treated less favorably than similarly situated co-workers who were not in her protected class.  Because the court agrees that Tilson has not established a *prima facie* case of sex or pregnancy discrimination, the court does not address pretext.

A.    *Adverse Employment Action*

The undisputed facts show that Tilson did not suffer any adverse employment action, with the possible exception of the loss of overtime pay for one

half hour.  Not everything that makes an employee unhappy will support a claim of illegal discrimination under Title VII.  *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007), quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000).  To be actionable, the employment action "must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits."  *Id.*  The Seventh Circuit has categorized materially adverse actions into three general groups involving:  (1) the employee's current wealth, such as compensation, fringe benefits, and financial terms of employment, including termination; (2) the employee's career prospects, thus affecting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to "humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in [her] work place environment."  *Lewis*, 496 F.3d at 653, citing *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744-45 (7th Cir. 2002).

Tilson contends that her reassignment to the administration office, her assignment to second shift rather than first shift upon her return from maternity leave, her removal from her role as administrator for the Marion County Traffic Safety Partnership for the Lawrence Police Department, and the denial of her overtime request all meet this standard.  Defendants concede that loss of overtime is an adverse action.  Tilson's remaining assertions are examined in turn.

1.    *Reassignment to Administration Office*

Tilson contends that her reassignment to the administration office one or two months prior to the time when she would have requested light duty herself amounted to an adverse action because in the administration office she no longer had the supervisory responsibilities that she had as a sergeant.  Pl. Response 17. Tilson has offered no actual evidence to support this assertion.  It is true that under some circumstances, a reassignment with a significant decrease in job responsibilities can constitute an adverse employment action.  See, *e.g.*, *Dahm v. Flynn*, 60 F.3d 253, 257-59 (7th Cir. 1994).  However, in this case, Tilson did not lose her rank, and she does not assert that this temporary reassignment impaired her compensation, benefits, or career prospects.  See, *e.g.*, *Nichols v. Southern Ill. Univ.*, 510 F.3d 772, 780-81 (7th Cir.2007) (no adverse action where plaintiffs were unable to show that undesirable assignment affected their salaries, perks, or opportunities for future advancement); *O'Neal v. City of Chicago*, 392 F.3d 909, 912-13 (7th Cir. 2004) (officer's transfer arguably offered fewer overtime opportunities, less supervisory responsibilities, and less flexible schedule but was not an adverse action because officer's complaints amounted to a purely subjective preference for one position over another).   Tilson was temporarily reassigned to administrative duty, a reassignment that she testified she would have sought voluntarily herself only one or two months later.  On this evidence, a reasonable jury could not find that Tilson's assignment to the administrative

office amounted to an actionable adverse action for purposes of her sex and pregnancy discrimination claims.

2.   *Assignment to Second Shift After Maternity Leave*

Tilson requested that she be assigned to first shift when she returned from maternity leave.  She argues that the department's decision to assign her to second shift (and to keep her there, when a first shift position opened) constituted an adverse employment action for purposes of her discrimination claims.  Pl. Response 17-18.  In particular, she argues that she was informed of her shift assignment only a few days before she returned from maternity leave, and because she had planned on being assigned to first shift, she had to "scramble" to make child care arrangements, which she described as a stressful task.  Again, she offers no legal authority for her argument.  To prevail, Tilson must demonstrate that her assignment back to second shift instead of first shift was "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Nichols*, 510 F.3d at 779-80.  She must show that she suffered a reduction in pay or benefits or a significant diminution in job responsibilities.  See *O'Neal*, 392 F.3d at 911.  She has not done so.  The uncontroverted evidence shows that Tilson made more money on second shift, not less.  Although she suffered an inconvenience upon learning that she was incorrect in her assumption that she would be assigned to first shift, her last-minute stressful "scramble" to find child

care does not bring her shift assignment to the level of an adverse employment action that could be the subject of a federal lawsuit.

### 3.   *Marion County Traffic Safety Partnership*

When Tilson returned from maternity leave, she was informed that she would no longer be responsible for administering the Marion County Traffic Safety Partnership on behalf of the Lawrence Police Department.  Tilson argues that the removal of her administrative duties was an adverse action for purposes of her discrimination claims.  Although Tilson argues that she lost pay as a result of the removal of her administrative duties, see Pl. Response 18-19, she misconstrues the record.  Tilson testified that she completed her administrative duties during her normal work hours and that she did not receive any extra pay or benefits for her administration of the Partnership.  Tilson Dep. 35-36.  Without such a showing, the temporary removal of her Partnership administrative duties is not an adverse action sufficient to support Tilson's claims of discrimination.  See *O'Neal*, 392 F.3d at 911.

### B.   *Similarly Situated Employees*

Tilson has only shown one possible adverse employment action upon which her sex and pregnancy discrimination claims might rest:  the denial of her request for one half hour of overtime pay based on her presence at the accident scene on August 25, 2005.  Defendants do not contest the fact that a denial of overtime

amounts to an adverse action.  Def. Br. 21.[3]  However, Tilson's *prima facie* case with respect to that incident fails because she has not offered evidence that she was treated differently than anyone similarly situated outside her protected class. Employees are similarly situated if they are directly comparable in all material respects. See *Crawford v. Indiana Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004). Here, Tilson has not offered evidence of any male or non-pregnant employees who were granted overtime while she was not, much less that any decision to grant or deny overtime was made under reasonably similar circumstances where an officer remained on duty after being ordered to leave.  Tilson's *prima facie* case of sex and pregnancy discrimination fails.  The court need not discuss pretext.

II.    *Sex and Pregnancy Harassment Claims*

Tilson also advances claims under Title VII that she was harassed due to her sex and her pregnancy.  To succeed on these claims, she need not show a specific adverse employment action, but she must offer evidence that:  (1) she was subjected to unwelcome harassment;  (2) the harassment was based on her sex and/or pregnancy;  (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create a hostile or abusive atmosphere; and (4) there is a basis for employer liability.  See *Bellino v. Peters*, 530 F.3d 543,

---

[3]The court wonders whether the loss of one half hour of overtime pay would be sufficient by itself to support a federal sex discrimination lawsuit, but defendants have not pressed the issue.

551 (7th Cir. 2008) (disability harassment); *Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (sexual harassment); *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (sexual harassment); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (racial harassment); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002) (sexual harassment).[4]  In their reply brief, defendants argue that Tilson's claims fail on the second and third prongs of this test because Tilson cannot show that the treatment she received was related to her sex or her pregnancy, and because the treatment she received was not severe or pervasive enough to alter the conditions of her employment and create a hostile work environment.[5]

_____

[4]The parties have not cited a case specifically addressing the merits of a pregnancy harassment case.  Such cases seem to be rare. Courts that have reached the merits of such claims have adapted the standards used for other harassment cases, and this court sees no reason to deviate from that reasoning here. See, *e.g.*, *Habben v. City of Fort Dodge*, 472 F. Supp. 2d 1142, 1168 (N. D. Iowa 2007); *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 863 (D. Md. 2000); *Carnes v. MCI Telecomm. Corp.*, 1997 WL 767013, *11 (N. D. Ill. Dec. 4, 1997).

[5]Defendants did not address Tilson's sexual/pregnancy harassment claims in their opening brief, apparently because they did not believe she was actually asserting such claims because they were not pled in a separate claim in her complaint and because in her deposition,  Tilson testified that she had never been sexually harassed at the Lawrence Police Department.  Def. Reply 11.  Tilson argues that because defendants did not present argument regarding this claim in their opening brief their argument is waived.  Tilson Br. 15-16.  Ordinarily, the court would be receptive to this waiver argument.  See, *e.g.*, *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B – a ground the movant might have presented but did not.") superceded on other grounds by statute, *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1119-20 (7th Cir. 1992).  But the waiver argument is not persuasive where the plaintiff testified she had not been sexually harassed.  Local Rule 56.1 allowed plaintiff to file a surreply if she wished to do so, and the court believes she has had a fair opportunity to

(continued...)

Tilson now contends that several separate incidents are evidence of a campaign of sex and pregnancy harassment by Cantwell and Bailey. She points to being placed in dispatch and being removed from her Partnership administrative duties, being assigned to drive the district car, being assigned to the administrative office earlier than she would have liked, and Mayor Cantwell's "C*** Club" meetings. Pl. Response 26-29.[6] None of these incidents are sufficiently connected to Tilson's pregnancy so as to satisfy the second element of the hostile environment analysis for purposes of her pregnancy harassment claim. See *Bellino*, 530 F.3d at 552 (disability harassment); *Luckie*, 389 F.3d at 713-14 (racial harassment). As for Tilson's sexual harassment claim, only Mayor Cantwell's frequent use of the term "c***" in connection with female police officers is sufficiently connected to sex to satisfy that prong.

---

[5](...continued)
address the issue. See *Bailey v. Skipperliner Indus., Inc.*, 278 F. Supp. 2d 945, 964 (N.D. Ind. 2003) (addressing issue on summary judgment where opposing party had ample opportunity to respond to opponent's argument). There is no need for a further round of briefing here. The court will reach the merits of Tilson's harassment claims.

[6]Tilson also contends that Mayor Cantwell and Chief Bailey treated similarly situated co-workers outside of her protected class better than she was treated, and that "the evidence in the record creates an inference that Bailey, who was aware of Cantwell's animus towards Tilson because of her sex, participat[ed] in harassing Tilson for purposes of gaining favor with Cantwell and advancing his professional and political career." Pl. Response 27-28. However, Tilson does not explain how she was treated disparately for purposes of her harassment claim – much less how this disparate treatment might amount to actionable harassment – nor does she explain how this inference that Bailey harassed her to further his career is supported by the record. The court is not obligated to develop these arguments on Tilson's behalf and analyzes her harassment claim only based on the instances of alleged harassment Tilson specifically articulated.

Even so, the evidence of Cantwell's "C*** Club" meetings does not support Tilson's sexual harassment claim. There is no evidence that Tilson herself even knew about these meetings before she filed her lawsuit, let alone that she was directly exposed to this conduct.   Tilson Dep. 228-30.   She learned of Mayor Cantwell's frequent use of the word "c***" in connection with female police officers only when she was contacted by an attorney working on another case.   "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)." *Mason v. Southern Illinois Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000); see also *Whittaker*, 424 F.3d at 645; *Mannie v. Potter*, 394 F.3d 977, 982-83 (7th Cir. 2005). Tilson cannot establish her harassment claim based on these comments, and her sex and pregnancy harassment claims fail on this basis.[7]

Even if Tilson's other allegations – being assigned to dispatch, losing her Partnership administration duties, driving the district car, and being assigned to the administrative office – are viewed through the lens of Mayor Cantwell's "C***

---

[7]The court addressed some other ramifications of this same evidence regarding former Mayor Cantwell in *Troutt v. City of Lawrence*, 2008 WL 3287518, *11 (S. D. Ind. Aug. 8, 2008), another case brought by a female Lawrence police officer.   Among other claims, Troutt alleged a sex-based failure to promote.   She did not bring a harassment or hostile work environment claim.  Based in part on the evidence of Mayor Cantwell's "C*** Club" meetings with the leadership of the police department, the court concluded that a reasonable jury could find, in Troutt's case, that Mayor Cantwell's attitude toward female police officers resulted in actionable discrimination against Troutt, so that summary judgment was denied.  The court considers the same evidence here, but Tilson has not shown that in her case, Mayor Cantwell's attitude toward female police officers resulted in any actual discrimination or harassment against her.

Club" meetings, they do not amount to actionable harassment.  To demonstrate that the treatment she suffered was hostile, Tilson must offer evidence that her workplace was objectively and subjectively offensive.  See *Rhodes*, 359 F.3d at 505.  Courts examine several factors to determine whether alleged harassment is objectively offensive, including the frequency of the conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the alleged victim's work performance.  See *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000); see also *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).  Whether taken individually or in the aggregate, the incidents Tilson addresses do not amount to an objectively offensive environment.  These various assignments were well within her duties as a police officer, and there was nothing physically threatening, humiliating, or severe about any of them.  Tilson has presented no evidence from which a jury could find that her workplace was objectively offensive.  Her harassment claims fail accordingly.

III.    *Family Association Claim*

Finally, Tilson asserts a claim under 42 U.S.C. § 1983 that defendants violated her family association rights as protected under the Fourteenth Amendment's substantive due process doctrine.  She claims that defendants did so by targeting her for harassment and/or discrimination because of her

association with her father, a political adversary of former Mayor Cantwell.[8] Ordinarily, this claim would be analyzed under the basic framework for claims arising from the substantive component of the due process clause of the Fourteenth Amendment.  See *Christensen v. County of Boone*, 483 F.3d 454, 461-62 (7th Cir. 2007).  The court would first determine whether Tilson's interest was "fundamental" (an interest so deeply rooted and sacrosanct that no amount of process would justify its deprivation) and then whether defendants interfered "directly" and "substantially" with Tilson's exercise of that right.    See *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997); *Zablocki v. Redhail*, 434 U.S. 374, 386-87 (1978).  Then, if the court determined that a fundamental right had been impaired, it would determine whether defendants' action could find "reasonable justification in the service of a legitimate governmental objective," or if defendants' actions were instead "arbitrary, or conscience shocking, in a constitutional sense."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

Defendants do not dispute that Tilson's right to associate with her father is fundamental.  However, Tilson has not offered evidence that defendants interfered directly, substantially, or at all with that fundamental right.  Tilson testified that neither Cantwell, Bailey, nor anyone else associated with the City of Lawrence ever prevented her from maintaining a relationship with her father.  Tilson Dep. 254-

---

[8]In her complaint, Tilson brought her freedom of association claim under both the First and the Fourteenth Amendments.  On summary judgment, she offers arguments under only the Fourteenth Amendment substantive due process theory.  Accordingly, Tilson's First Amendment claim is waived.

55.  Her claim fails to survive summary judgment on the merits, without reaching the defense of qualified immunity.[9]

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is granted.  Final judgment will be entered accordingly.

So ordered.

Date: August 20, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com,tralstin@stephlaw.com

Denise K. LaRue
HASKIN LAUTER & LARUE
dlarue@hlllaw.com

Ryan Patrick Sink
HASKIN LAUTER & LARUE
rsink@hlllaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

---

[9]Because Tilson sued Chief Bailey in his both his individual and official capacities, and because Tilson's father is now the Chief of Police, her father is now actually a defendant in her lawsuit, in his official capacity, though that claim is redundant because Tilson has also named the city as a defendant.